## UNITED STATES v. JELENKO et al.

District Court, D. Maryland. January 10, 1927.

No. 795.

Internal revenue ⊕⟹9(27)—Capital and income of real estate business held to belong to partnership, and not subject to excess profits tax as property of corporation (Act Feb. 24, 1919, §§ 300–305 [Comp. St. §§ 6336⅛a-6336⅛cc]).

A real estate business owned and conducted by two men who were partners *held* to belong to the partnership, and not to a corporation created by them as a business convenience in taking title to and conveying real estate in some cases, but which they owned entirely, and which had no capital paid in and no assets, except real estate so temporarily held in its name, and the income of the business *held* not subject to excess profits tax as that of a corporation made applicable to partnerships in 1917 by Act March 3, 1917, §§ 200–207, 39 Stat. 1000, Act Oct. 3, 1917, §§ 200–214 (Comp. St. §§ 6336⅜a-6336⅜o), but thereafter payable by corporations only under Act Feb. 24, 1919, §§ 300–305 (Comp. St. §§ 6336⅛a-6336⅛cc).

In Equity. Suit by the United States against S. Victor Jelenko and David G. Rosenstock. Decree for defendants.

Amos W. W. Woodcock, U. S. Atty., of Baltimore, Md.

Julius H. Wyman, of Baltimore, Md., for respondents.

SOPER, District Judge. The United States has filed a bill in equity to recover income and excess profit taxes for the year 1919, claimed by it to be due by the Realty Mart, Inc., a corporation formed to engage in the real estate business. The individual defendants are sued because the corporation has been dissolved, and it is said that the defendants, who owned all of the stock, appropriated the entire assets of the corporation, and now hold them in the nature of a trust for the payment of the taxes due. On March 15, 1920, Jelenko, as president, and Rosenstock, as treasurer, executed and filed a partnership and personal service corporation return of income for the year 1919, showing a profit on sales of $41,804.40.

Other income from commissions and brokerage, interest, rentals, and other sources brought up this total to $67,295.31. Deductions therefrom for expenses, repairs, interest, taxes, wear and tear, and depletion produced a net income of $42,441.22, which was distributed one-half to Jelenko and one-half to Rosenstock, according to the return. Subsequently the correct amount of the net income was shown to be $46,757.53.

In November, 1924, the Commissioner of Internal Revenue, under the authority of R. S. § 3176 (26 USCA § 97 [Comp. St. § 5899]), assessed against the corporation for the year 1919 taxes aggregating $17,168.46. The amount claimed, however, is now fixed at the sum of $14,037.65, a reduction having been made by the United States because of abnormal conditions, under the authority of sections 327 (d) and 328 of the Act of February 24, 1919 (40 Stat. 1093 [Comp. St. §§ 6336⅛j, 6336⅛k]). Although the corporation paid no tax, the defendants accounted for the net income shown by its return, in their individual income tax returns. The government has suggested that the taxes paid by them should be returned by the amount of $4,591.22, in view of the assessment against the corporation, so that the amount actually involved in this controversy for the year 1919 is $9,446.43.

The United States contends that the corporation return for the year 1919 was incorrect, in that therein the corporation claimed to be a personal service corporation, exempt from taxation under sections 200 and 218 (e) of the Act of February 24, 1919 (Comp. St. §§ 6336⅛a, 6336⅛i), whereas in fact the corporation did not come within those sections of the law. It would appear from the return that much more than 50 per cent. of the gross income of the business consisted of gains, profits, or income derived from trading as a principal, and a corporation doing such a business is expressly excepted from the provisions of section 200 of the act. But the defendants on their part assert that the return of 1919, although filed in the name of the Realty Mart, Inc., and signed by them as president and treasurer, respectively, was intended to show the income of a partnership of which they were the members, and that the corporation had no capital and no income during that year, or at any other time. The liability of the defendants depends upon whether the capital and income of the business belonged to the corporation or to the partnership.

During the period between June, 1908, when the corporation was formed, and De-

cember 30, 1920, when it was dissolved, the conduct of the defendants was not entirely consistent with either theory. A number of well-established circumstances tend to show that the business belonged to the corporation. In the first place, a series of corporation tax returns were signed and sworn to by the defendants, as president and treasurer, respectively, for the years 1914 to 1919, inclusive. The return for 1914 showed paid-up capital stock of $1,000; indebtedness of $8,500 to the bank; gross income of $18,113.84, and deductions therefrom. of $17,970.55, including salaries of $3,500 per year paid to each of the defendants as officers of the corporation. For the year 1915 a similar return showed paid-up capital stock of $1,000; indebtedness to the bank and others amounting to $12,490; gross income of $14,987.67, and deductions therefrom of $15,245.55, including salaries of $2,850 paid to each of the defendants. The return for 1916 showed paid-up capital stock of $1,000; indebtedness to the bank, building associations, and others of $44,197; gross income of $17,830.95, and deductions therefrom of $17,063.43, including salaries of $3,500 paid to each of the defendants. The return for 1917 shows the same paid-up capital stock; indebtedness to the banks, building associations, and others of $37,729.54; gross income of $15,156.90, and deductions therefrom of $18,009.49, including aggregate salaries to the defendants of $8,145.80. In each year the salaries drawn by the defendants were accounted for in their individual income tax returns.

On September 30, 1918, the defendants filed in the name of the corporation a capital stock tax return for the year ending June 30, 1918, which showed assets of $67,771.10 and liabilities of $29,928.30, or a balance of $37,842.80. After deducting the exemption of $5,000, the balance was taxable at the rate of $1 per thousand, and a $32 tax was paid to the government. There were no doubt additional capital stock tax returns in other years. The only other one in evidence was filed July 20, 1920, as of June 30, 1920. This return, however, shows no assets and no liabilities. Since, as a matter of fact, the business was possessed of both assets and liabilities in substantial amounts at this time, the return was evidently filed on the theory that they belonged to the partnership, and not to the corporation.

On June 16, 1919, there was filed the first partnership and personal service corporation income tax return by the defendants. It related to the calendar year 1918, and was filed in the name of Realty Mart, Inc., but expressly purported to be the return of a partnership. The gross income amounted to $30,257.38, and deductions therefrom to an equal amount, including therein $12,805.95, divided equally between the defendants, and scheduled with some confusion as salaries or other compensation and also as dividends. The interest of each defendant in the partnership or number of shares in the corporation is stated to be one-half. On March 15, 1920, there was filed the partnership and personal service corporation return of income for the year 1919, which has already been described. The question as to whether the business was that of a partnership or personal service corporation was not answered, but there are indications in the blank that it was intended as a partnership return, and it shows, in a similar fashion to the 1918 return, that the net income was divided equally between the defendants.

In addition to these formal reports, there were filed during the years 1918 and 1919, reports by the corporation to the Maryland state tax commission. Since the Maryland law does not require a report of real estate, there is nothing upon the returns to indicate whether the property operations of the business were considered by the partners as partnership or corporate activities. The only assets shown on the reports are a judgment of $800 and office furniture in one year, and an automobile in another.

Certain correspondence is also relied upon by the United States as indicating that the business belonged to the corporation in the view of the defendants. On July 14, 1919, the defendant Jelenko sent a letter to the collector of internal revenue at Baltimore inclosing a personal service corporation return. He stated that, for the purposes of convenient bookkeeping, the account of all properties bought and sold by him and Rosenstock as partners which were on the land records in their individual names, were kept in the same account with the Realty Mart, Inc.'s business; that the Realty Mart occasionally took title to property as straw men, in order to create ground rents, and since the corporation was owned by Rosenstock and himself, the return was made without attempting to segregate the properties. On November 12, 1919, the Deputy Commissioner requested certain information from the corporation, in regard to its capital stock tax for the year ending June 30, 1919. In response the defendant Jelenko stated that the nature of the business of the corporation was that of real estate broker and the collection of rents; that it was also used in

business as a straw man in the conveyance of properties, for the purpose of creating ground rents and for other temporary purposes; that it was organized with a nominal capital stock, largely for the purpose of getting a good name under which to operate a real estate business, and since all of the stock was owned by the defendants, and they devoted all of their time to the business, the corporation would seem to be a personal service corporation. He stated, further, that the corporation did not make loans or advances to customers or clients, and did not buy or sell on its own account, and that customers were billed only for commissions and rents due. On March 15, 1920, the personal service corporation return for 1919 was sent to the collector of internal revenue at Baltimore. In an accompanying letter, Jelenko stated that the return was made as a personal service corporation because the corporation was merely an incident of the business, and used only for the purpose of a straw man in creating ground rents and mortgages; that all the real estate dealt in was bought and sold in the names of the members of the firm, but, for the purpose of simple bookkeeping, only one set of books was used for all transactions, including money received for commissions, etc. It was contended that the corporation was a personal service corporation.

On October 22, 1923, attorneys of the defendants communicated with the Commissioner of Internal Revenue in regard to an additional tax assessed against the corporation for the years 1918 and 1919. Therein it was again stated that the corporation was used by the partnership for the purpose of creating ground rents. The Maryland system of ground rents was explained. It was said that all the books were kept in the name of the partnership, and practically all of the transactions were handled in the names of the defendants, trading as the Realty Mart, but that it had been found, in going over the court records, that some transactions were inadvertently handled in the name of the Realty Mart, Inc. A list of these transactions was attached, showing that there had been gross sales in the name of the corporation in 1918 to the amount of $6,000, with a net profit of $418.06, and in 1919 gross sales of $14,525, with a net profit of $6,758.42.

The bank account of the business during the greater part of the period in question was kept in the Old Town Bank. It appeared in the name of the Realty Mart (not including the designation "Inc."), and the

checks were signed by Jelenko, president, and by Rosenstock, treasurer. This practice continued until a new signature card was made out in the month of December, 1920, a few weeks prior to the formal dissolution of the corporation. The new card contained the following names: "Realty Mart, S. Victor Jelenko and David G. Rosenstock"— both signatures being required. Subsequent to the dissolution of the corporation, the defendants continued to issue checks upon the account in the Old Town Bank in precisely the same form as they had been used prior to the dissolution of the corporation, and it seems likely from the testimony that this form of check was continued until the checks on hand were exhausted. It may be, however, that the purpose of the change of the signature card in December, 1920, was because the corporation had been dissolved, and it was supposed that new signatures were necessary.

In the correspondence which took place between the Commissioner and the defendants, the president of the Old Town Bank on December 10, 1923, stated in writing that, during the existence of the corporation, the bank regarded it as the agent of the partnership, composed of Jelenko and Rosenstock, and in extending credits to the corporation, all loans were based upon the personal responsibility of the defendants, the notes in all cases being signed by them individually; the indorsement of the corporation was required as an additional safeguard, to bind any assets that might temporarily be in its custody; that the bank understood that the corporation was acting as agent of the partnership; that all funds in its name were held as such agent; and that the corporation owned no assets, except such as were temporarily held by it as agent. The notes delivered to the bank for borrowed money were the personal notes of the defendants, payable to the Realty Mart, and indorsed by the defendants individually.

During the month of December, 1919, one year before the dissolution of the corporation, an account was opened in the National Union Bank of Maryland in the name of the Realty Mart, S. Victor Jelenko and David G. Rosenstock. There was nothing to indicate that it was a corporation. So far as the evidence discloses, the funds in this bank were used in the business indiscriminately with those in the Old Town Bank.

These circumstances, although not entirely consistent, make out a strong prima facie case for the government's contention. The defendants stated again and again in formal

documents in effect that the business belonged to the corporation. If in fact the corporation did not own the business, there is no explanation for their conduct, other than ignorance or loose thinking on their part. It should be said, in fairness to them, that there is no suggestion of fraud. Indeed, from a financial standpoint, it was largely a matter of indifference whether the returns were made by the corporation or by the individuals as a firm. Apparently the net result of the taxes to the defendants was as great or greater in the case of the corporation as it would have been in the case of a firm. Moreover, the motive of limited liability from the corporate form had little play, for the obligations of the business were issued in the names of the partners, and most of the real estate was registered in the land records in their names. It is not unlikely that no change would have been made, and that reports in the corporate form would have been continued, had it not been for the creation of the excess profits tax. This was applicable to partnerships in 1917 (39 Stat. 1000, §§ 200–207; 40 Stat. 302, §§ 200–214 [Comp. St. §§ 6336⅛a–6336⅜o]), but thereafter, was payable by corporations only. 40 Stat. 1088, §§ 300–337 (Comp. St. §§ 6336⅞₆a–6336⅞₆p).

In 1918 and following years, therefore, the taxes payable by the defendants' business, if it were corporate in form, were considerably larger than if it were a partnership. Moreover, the business and profits of the defendants seem to have materially increased at this period, due no doubt in part to the general inflation of values following the Great War. The defendants state that the corporation was dissolved, because it was found that the inconvenience and trouble involved in complying with the various exactions by the United States more than offset any benefit from its existence. It is not unlikely that the controlling motive was the increase in corporate taxes. The government ought to recover on this showing, unless it is clearly made to appear that notwithstanding their repeated statements to the contrary, the business in fact belonged to the defendants as copartners, and the corporation was one in name only. No question of estoppel being involved, it is proper to examine, not only the defendants' statements, but the actual conditions under which the enterprise was conducted.

When all the facts are ascertained, it is no longer clear that the business belonged to the corporation rather than to the partnership, or that the defendants were justified in filing the corporate returns referred to. It is not unusual in a close corporation to find that corporate forms are too loosely observed, and it is not always easy to decide in a particular case whether the business organization falls on one side or the other of the corporate line. In the case at bar, such observance of the corporation law and the corporate form as was had was reduced to a minimum. In fact, it is almost, if not entirely, correct to say that there was nothing about the whole enterprise except the corporate charter to indicate a corporation. An outline of the history of the business makes this clear.

Jelenko and Rosenstock began to deal together in real estate in the year 1906 in a more or less small way. In the following year, 1907, they formed a partnership on equal shares. They adopted the name of the Realty Mart for business purposes. It is quite customary, in handling real estate in Baltimore City, to create a lease, reserving a ground rent on the land, and to dispose of the leasehold interest to one party, and the reversion, or ground rent, to another. Until the sales are made, both interests are retained by the party handling the transaction; and it is necessary to hold the reversion in one name and the leasehold in another to prevent a merger. For this purpose, if for no other, it was convenient for the defendants to form a corporation, and in June, 1908, a charter was filed. Certificates of stock were issued in the amount of $1,000, one-half being held by each of the partners. No money was paid for this stock. No other stock has ever been issued. No meetings of the corporation, either of stockholders or directors, have ever been held. How the officers were originally chosen does not appear. No corporate books or records were ever made or kept. No change was made in the stationery used, but the name, Realty Mart, adopted before incorporation, was preserved. No salaries were ever voted, and no dividends were ever declared.

Unless the bank account in the Old Town Bank may be considered to be the bank account of the corporation, it was never possessed of any money whatsoever. All the capital deposited therein was contributed by the partners, in order to carry on the business; and no contract on the part of the corporation, either in the form of stock certificates or promissory notes, was issued to them to evidence an indebtedness. Nor was credit given the defendants upon corporate books of account. In fact, the corporation had no books of account. The records of business

transactions have always been in the name of the partnership. There was no change on the books of account in the year 1908, when the corporation was formed, indicating that the business had been transferred from a partnership to a corporation. Nor was there any change between 1908 and 1920, during the life of the corporation, and no change upon its dissolution.

Licenses as real estate brokers for 1918 and 1919 were issued by the state of Maryland to the defendants, individually, trading as the Realty Mart. The chief benefit which the parties derived from the existence of the corporation was undoubtedly in connection with real estate transactions on the land records. The year 1919 is perhaps typical. Fifty-four transactions or sales of property were made in that year. Of these 36 appeared in the names of the partners, while in 18 the name of the corporation appeared in one form or another. In 16 of the 18, leases were created, and the corporation appeared either as lessor or lessee. In one or two cases in which leases had been intended, the property was sold without leases, and in these cases the name of the corporation only appeared as owner. However, as will appear from what has already been said, the corporation as such advanced no money and received no profits in any of these transactions; statements emanating from the defendants to the contrary notwithstanding. Its connection with them was nominal only.

Under all these circumstances, can it be said that the business and the income therefrom belonged to the corporation in 1919? Some light may be thrown on the subject by supposing that the situation had been reversed. If it were to the interest of the United States or of the creditors of the business to show that it was a partnership, rather than a corporation, and that the defendants should be held personally liable, would the court hesitate to say that it was a partnership? Except for the corporate returns, the defendants dealt with the concern in every way as if it belonged to them in their own right. The contention that it was in law the business of the corporation, and that the defendants were its stockholders or creditors, can be maintained only if it is found that the money in the Old Town Bank belonged to the corporation, and the books of account were its books, although kept in the name of the firm. Otherwise, the corporation was only a legal concept, a name to be used as a business convenience, with no means to conduct substantial transactions in real estate. But the facts in connection with the moneys on deposit and the books of account are not consistent with the theory of corporate ownership. It would be, in the opinion of the court, a forced construction to hold that the mere grant of a corporate charter, and the occasional use of the corporate name, so changed the legal situation that the business became corporate in law, although the activities of the defendants were continued as theretofore in the partnership relation.

The defendants have shown by a preponderance of evidence that the Realty Mart, Inc., had no income in 1918, and hence the bill of complaint should be dismissed.